You may be seated. The clerk will call the next case. 315-0744 MHR Estate Plan, LLC, edited by Joseph Marconi, v. K G Partnership, en route to Mercy Community Church, et al. Housed by Michael Collins. Mr. Collins, you may proceed. Morning, Court. This may I approach and be selected? Absolutely. Welcome. This is my first time in your courtroom. I'm impressed by the whole building. It's a beautiful courtroom, isn't it? Yes. It's a beautiful courtroom. Yes, although the building next door needs a little work, I admit. Thank you for the opportunity for oral argument. It's becoming less and less of a custom. As you know, I represent the appellates in this case, which are essentially two trusts. One is the Koumissos Trust. Ruth just recently passed last month. The successor trustee is now her daughter, Kim Haley. And then Arlene Glavin is the successor trustee of the Glavin Trust. Collectively, they own 68.75% interest in K&G Partnership, which is what this dispute is about. This dispute is about the dissolution and liquidation of that partnership that was filed by MHR's State Plan, LLC, which is effectively the party in interest is essentially Michael Rose. Now, we're here today seeking essentially relief from the trial court's order awarding a sale of the partnership property to an outfit called, I think it's Olympia Acquisitions or Olympia Investments. I forget the exact name, but I think it's effectively another Rose-controlled entity. Olympia has not appeared in this appeal in any independent way. And the reason that we're seeking relief from that order is that we believe it was inappropriately rendered by... You're seeking relief from several orders, though. There are several orders. So when you talk about order, you might be able to help us if you refer to the order itself. We're seeking to reverse the order of October 21, 2015, authorizing the liquidator receiver to contract with Olympia and to remand the case to either instruct the court to accept our higher and better offer to purchase the assets of the partnership or to set the procedure where people who are interested in the bioproperty could compete and pit against each other to purchase the property. Or, as an alternative, we started out this case because there's an arbitration clause in the partnership agreement with a motion to dismiss that was denied. We continue to renew that from time to time, and we believe it is appropriate to bring that to the court's attention at this time, even though we didn't appeal it within 30 days of entering it, because, as I understand, Supreme Court Rule 366, you're going to get a jurisdiction once more properly before you over all the court's orders, even in the locatory appeal, and we cited those particular cases. But those are the alternative reliefs we're seeking in this particular case. Now, with respect to the sale, a couple of things. Number one, there was a sale order entered to sell the partnership property. Under that sale order, there was a reservation in that order that no deal was going to go down until they went back to the trial court and the trial court approved the price and the terms of that particular deal. So the liquidator receiver, who, by the way, is not in possession, is just facilitating the sale prices. The partnership is very profitable, and it's not in distress, and it's well-managed, and it's part of two adjacent parts under common management. It continued throughout this litigation, and we managed that. We gave the authority to our broker to go out and solicit the property, which happened, and he solicited, and I'm not going to use the word offers or bids because they weren't. They were proposals of interest is what ended up happening. So back in, I think, May and July last year, the liquidator receiver, he solicited. There were people interested. There was a number of letters of intent that were submitted. We submitted a contract. The Olympian Investments submitted a letter of intent. And that led, the number of them, led to a second request by the liquidator, which he called a best and final round, he expected that. And then there was this, quote, best and final round that he advertised as the broker. And it, again, it produced only really one legal offer, and that was my client's offer for $11.5 million. The other word offers, they were solicitations of letters of intent, explicit language, non-binding letters of intent, but showing an interest in the deal. And then there was the Olympian Investments, which, contrary to the sale order, contrary to partnership law, contrary to everything that happened in this case, didn't bid on the property. It bid on my client's partnership interest, wanting to take over the partnership interest, partnership, keep it intact, and own my client's partnership interest. Now, mind you, they filed this case to liquidate it and dissolve the partnership. Now they want to keep it intact and bind it. So we objected to that. And that went to, excuse me, an evidentiary hearing on our objection. And we presented to the court what I just told you. There's no offers out there but ours for $11.5 million. I don't know what they're bidding on, but that's not what's for sale. They can't buy our particular interest. And we go through this hearing, and we win. Judge agrees. He says, you're right. There's a qualitative difference in their bid. They didn't bid pursuant to the sale order. He presented evidence at the hearing. It's much more advantageous. But keep the partnership intact. We're not going to have to report to the recorder the sales price, which will lead to the assessor looking at the value of the property. It's assessed at about $900,000. And we're talking recall $15 million difference there. We're talking about Mike Rose not having to report any capital gain because his interest remains intact. We'll get expert testimony and all of these advantages at that hearing. So the hearing ends. The court rejects that receiver's suggestion or the receiver's recommendation to take the Olympia proposal, which, by the way, was the only person he negotiated with. One person, Olympia. Olympia submitted an offer that didn't even comply with the sale order, and that was the one person he negotiated and went to and talked to. That was at the hearing. That was the receiver's own testimony. So the order's going to be entered denying the bid. We come back into the courtroom 15 minutes later, and a question is raised. And so the judge tells us, well, what's the question? Well, the question is can the Olympia reform its bid to make it a bid for the assets instead of a bid for the partnership interest and keep it at $12.6 million? Well, our immediate question is that everybody should be able to submit. No, only they get to. We were low, the court says. We're low. You don't get to reform it. So we, knowing the evidence that's before the judge, and one of the pieces of the evidence was I asked Karen, Mike Rose up on the stand, would your bid have been the same if it was for the assets? His testimony, didn't know. I don't know. So there was no evidence at the hearing that the judge just heard saying that the price is going to be the same if it's an asset purchase versus another purchase. So we go back after the court had indicated he's not going to let us bid any further. He's not going to accept ours, which is really the only valid offer, and he's going to let them go back and recharacterize and change their offer. We immediately filed a motion that says we're going to up our bid to $13 million, no contingencies, attach the binding bid, and then ask the court at a minimum to have the receiver contact the other bidders that come in and bid against us. That was all rejected. About three weeks later, NHR Olympia comes in with a new proposal. We again raise the same objections that we had before, some additional objections to the new proposal. They still don't have it right. The partnership technically owns the beneficial interest in the land trust in a mobile home park in Frankfort, Illinois. They keep wanting to buy the real estate. There's other representations made in the contract. There's other problems with the offer. The judge sets a briefing schedule. We wait. We come back. We're expecting some sort of, you know, opinion, written decision. No. Eventually we come back and he grants a petition. We file this appeal. We file this appeal for interlocutor delay to get away from that sell in order to do the release that I just asked. The question of justice. So right now the property is not controlled. And we're looking for this court, hopefully, to bring in and see what we're going to do. And, you know, I mentioned the jurisdiction on the arbitration. I mean, that's one thing that could be resolved. It sends us to arbitration over how this fails to be conducted. So we cited some case law in our brief on this situation where you have a partnership and there's nothing in the partnership agreement that discusses how it's going to be liquid. In both the courts, and I cited the cases, I think one was Polikoff versus Levy, and the other was Mandel versus Central Procure. Both of those said, well, the court's left with the alternative, have an auction. That would have been better than what we had here. We could have had an auction. We all could have bid. We could have bid against each other. All the partners could have bid against each other and see how high it got. Right now the court entered this order knowing that he had $400,000 more on the table than he let him proceed with, and under all those circumstances I described. So that's the relief we're seeking today. I think that that October order should be reversed, and one of those alternative reliefs should be granted. Either you look at the arbitration, say, hey, you know, this really never belonged in the court system. These parties have stipulated it. There's a contractual arbitration. That's one thing you could do. The other thing you could do is you could say, well, wait a minute. And this is where I get on the discretion of this court. Now, they have cases, and they are the cases, that the court is going to have discretion below on how to go about selling this particular property. And it's going to have discretion. But keep in mind what happened here. The court didn't do it based upon the evidence you're hearing. We won the evidence you're hearing. We were successful in knocking out their bid. So then the court just simply, through their representation, contrary to the testimony, that they're going to bid $12,600 on an asset sale versus a membership interest valuation, which, by the way, the actual price for the purchase of the membership interest wasn't $12,600. It was $8,600,000 change. And it included an assumption of the working capital, which effectively made it less than other parties who had submitted $2.5 million indications of interest. Almost two minutes. It's longer than I thought it would be. If you have any more questions, that's fine. But I've covered, I think, the points that I wanted to make. Any questions? No? Thank you. Thank you, Mr. Collins. You have five minutes. Mr. Marconi, you may proceed. May it please the Court, Mr. Collins? This whole case is about delay. There's a partnership agreement that makes it perfectly clear that the partnership was to dissolve in December 2010. There was a period of time where the plaintiffs here, a minority partner, gave the defendants here, the majority, an opportunity to unwind the partnership and cause a reasonable, inexpensive dissolution. That was totally rejected. That's why the petition was filed in late 2010, or I think it was 2011, whatever. Since that time, there are 16 volumes of record over a dissolution of a partnership that was clearly and unquivocally required under the partnership agreement. This appeal is the most recent part of the delay. This partnership should have been dissolved and liquidated in 2011, and we should have never come here and incurred all the expenses that we have over the last few years. Why? The reason why is, you heard counsel say, Kim Daly is not a trustee. Well, the manager of the property that's put in place by the majority is James Daly, her former husband. And the accountant who works on the books and records there is Mr. Glavin, who's also one of the defendants and a partner. They are using the partnership for livelihood, and they don't want to let that go. It's a very profitable operation. It's a part-time job, and they're making a substantial income as a result of it. That's why we're here. Now, I'd like to talk about a couple things. Jurisdiction first, and then the issue before the court. The issue before the court is whether or not the trial court properly exercised its discretion when it approved the contract on October 21, 2015. But let's talk about jurisdiction first. At this point, it really doesn't matter if the October 21, 2015 order is appealed under 304B2 or 307A. What is important, however, is that the other orders to which counsel refers should have been appealed under 307A. For example, the motion to compel arbitration, that is in essence, that is construed to be a motion for an injunction. When it's denied, because it's dismissed the case and ordered the parties to go to arbitration. That's appealable under 307A1. With respect to the new bids, counsel claims that the August 11, 2015, that's when the court said, no, no, no new bids. We're going to maintain the integrity of the initial silent bids. No new bids. That was August 11, 2015. That should have been appealed under 307A3. Okay? Because what they were doing is they were asking the arbitrator liquidator to accept additional bids. And the court said no. And then the order approving the receiver. You know, the brief, he didn't mention it today, but the brief writes about the appointment of the receiver. That should have been appealed under 307A2. And I invite the court to look at 307 and all of those are covered there. Why is that important? Because a motion for a re-hearing does not extend the time to appeal. You have to appeal those orders within 30 days. They did not do so. Those orders are now the law of the case, not subject to review by this court. And I said the case, it's not in our briefs, and I apologize for that. Trophy time versus Graham in 73 LMI Act III, 335. A 307 appeal has to be made within 30 days of the order, and a motion to re-hearing won't extend that. The other part of it is he's trying to couch his objections and various briefs that weren't motions for re-hearing into motions for re-hearing. So the court can ignore his attempt to review those prior orders, either under 307, or the fact that he never really did file a motion for re-hearing of those orders. Now, if we may, I'll move to the issue. And that's whether or not the trial court properly exercised discretion when it approved the contract. There's a lot of talk about bids. It was decided at the recommendation of the liquidated receiver, and there's a big report in the file, that a private sale would be much more profitable to the partnership than an auction. And an auction, you buy the property as is, the court is aware of what happens, but there's always a discounted price because it's an auction. Whereas in a private sale, where there's silent bids, you seek to get a premium. So the issue was, who's going to have the most money? Who's going to come up with the biggest amount of the purchase price? And that's what happened. There were five. Actually, there ended up being 11 bids. And what the receiver then did is he went to the court and he said, Judge, what I think we should do is take the five highest bids and ask them now to submit their best and final offers. Not looking at the terms of the transaction, but at the dollar amount. And the intent was that once a large dollar amount was received, the receiver was then authorized to negotiate with that person with the highest dollar amount to come up with terms that were reasonable and acceptable to the receiver and ultimately to the court. And that's what just happened. Now, the court wasn't happy with the first offer, because the court viewed an attempt to buy the partnership, not a sale of the assets. And of course, it was mainly because of the Fed's objection and rejected that. But the $12,600,000 offer was still the highest offer. And when it was suggested to the court that we'll recast our presentation or the contract to satisfy the objections, the court said that's fine. I'm mostly interested in coming up with the highest amount. Now, I'd like the court to read the quote, page 26 of our brief, where the trial judge says, The one thing I do believe is that these, the process, and keep in mind, it was an evidentiary hearing where the entire process used by the receiver was presented to the court. The receiver told them that they actually reached out to over 3,000 people, both locally and nationally, and they received 11 substantial bids. What the court says is the one thing I do believe is that these, the process, used is appropriate. And I think when you get the bids in, there's nothing unreasonable about taking what you believe to be the high bid and negotiating the contract with that bidder. That's what the trial court said. And there was nothing wrong with that. It's a common practice. Now, the highest bidder still... If this isn't going to work and you said it was because the appellants raised an objection to it, then what is the next step? Is it then, are the others then able to come in? Well, if you look at the record closely from that day, what the trial court first said is that, Well, I suppose then the receiver should start negotiating with the next highest bidder.  The plaintiff's bid was, Olympia's bid was $12,006,000. And he said, Well, now the receiver liquidator should negotiate with the folks at $12,005,000. And at that point, we raised the issue, Well, we're still at $12,006,000. We'll just retest it rather than starting over with the next lower bidder. See, our bid was $12,006,000. It was the structure of it that was objected to by the defendants. And what the court said, he didn't feel comfortable with. I mean, but it was still the same amount, $12,006,000. So, you know, there's nothing wrong in... At page 26, we quote from what the court said. He said, Look, they thought that the way it was structured was appropriate under the circumstances. The liquidator recommended it. The liquidator recommended it. And I just didn't agree with that. But, you know, we weren't making our offer contingent upon that. We presented the plaintiffs, or Olympia presented that offer to the liquidator. He said, Yeah, I'll present it to the court. But it wasn't this way or the highway. Our offer was still $12,006,000. And so it was recast. But, again, you know, although the order approving the contract was October, the permission to submit an additional bid was before that, and that order wasn't appealed. And there's been some, you know, I don't know if the court... There's been some talk about our subsequent offer that was approved, Olympia's subsequent offer that was approved, is somehow unsatisfactory. It was recommended by the liquidator, and it's a pretty standard contract. I mean, if you look through it, there was an objection regarding a number of items. Now, keep in mind, the contract, which is in the record at C-3470, is for $12,600,000 purchase price. There was only a 10-day pre-closing inspection period. And the 10 days began to run when the defendants, who, again, control the operations and control the numbers and control the books, when they delivered a list of contracts or documents that's listed on the contract, we had 10 days to look at those documents, and after that, we were bound to close. And the closing was set 80 days thereafter, which is not unreasonable in a deal of this size. And the liquidator, who's accustomed to these kind of deals, felt that it was a reasonable thing. And there's also some mention of the representations. But what the defense has done is completely, and the trial court realizes, is completely misconstrued the representations. And I directed the court's attention to paragraph 11, representations of sellers. The predicate to those representations are on and as of execution date, and on and as of closing date. Okay? And the big issue he's mentioning is the tax issue. Well, there is no existing pending contemplated, threatened, or anticipated change in the assessment of the real property. Well, what he's trying to say is that because we're paying more than what somebody did 20 years ago, it's automatically going to increase the taxes. Well, that's a silly argument. I mean, it's on or as of the execution date and on and as of the closing date. Was there any assessment pending? Was there anything going on that they had notice of that would affect the taxes? The purchase price alone isn't what's contemplated by that. That's a standard clause in every real estate contract. And so if you interpret it the way he wants to interpret it, none of them are ever final or enforceable because prices increase and taxes go up. The last is he says that it's indefinite when we close because we have a right to an extension. But if you read paragraph 27, which is the extension clause, what it says is we can buy a 30-day extension for $100,000. But at that point, our $250,000 deposit and the $100,000 are nonrefundable. So we'll forfeit $350,000. And what the liquidator told the court is, I view that as someone who wants to stay in the game and I'll give them a 30-day extension because that's someone who wants to close. And if they don't close, that's money that can be used to cover the expense that has been caused by the delay. $350,000. That's a serious bid. Okay, I just have one other point. The last thing he complains about is that the contract is assignable. And that's paragraph 15 of the real estate contract. Well, anybody who works in real estate knows that real estate contracts are assignable. This is not a condominium where there's a right of first refusal to the board. This is not a personal service contract where there's a personal relationship. That's where contracts are not assignable. Employment contracts, attorney-client contracts. This is a real estate contract. This is an asset. It was subject to blind bids. I mean, you didn't know who the bidder was. There was nothing in the court's order that says if the seller doesn't like the buyer, he doesn't have to contract. This is real estate. Personal assignments are typical. That's a standard clause. It borders on absurd for them to claim that that's a problem. With that, Your Honors, I request that you affirm the trial court and that we be allowed to go on with the sale and end this travesty, this expensive five-year battle over what should have been a very simple and quick liquidation of a partnership. Thank you. What's the status of the partnership now? Everybody's still bound together? It's in receivership? The status is what the defendants want. Jim Daley and Mr. Gladwin are running it and collecting fees. Not only that, one other point is the partnership is paying their fees, and so the plaintiff here is paying one-third of the fees to prolong this travesty. I'm going to ask the court to please help us. Affirm the trial court, order that the sale proceed forthwith, and let us get this behind us. Were any partners harmed on the bottom line by restructuring the offer from purchase of a 68% partnership interest to a purchase of 100% assets? No. In fact, just the opposite. The recasting, and I don't want to make this sound like we're trying to take advantage of the assessor, but the way it was structured, it would have helped the defendants, because Gateway 1, there's a Gateway 1, there's a Gateway 2, there's a Gateway 3. And common sense tells you if Gateway 1 goes way up in price, the assessor's going to look at that and say, well, we better evaluate Gateway 2 and 3. Both the plaintiffs and the defendants have an ownership interest in 2 and 3, so they bit off their nose to spite their face here. And if you look at the initial transaction that we submitted, you know, the purchase of the partnership, there was no injury whatsoever to the defendants. All he emphasized in the oral argument and all he emphasizes in the brief is the benefit that we would have derived. They would have derived more of a benefit on the taxes on Gateway 2 and Gateway 3, but they rejected that. Now, there's an issue about $300,000 in working capital that was in the partnership, but there was no prohibition, first of all, to distribute that. So the partnership that they controlled could have distributed it and brought it down to net zero. And when that was brought up, because we don't have the books. So, you know, we were in court and they came in and said, well, that's $300,000, that's a richer deal. We don't have the books. We told the charges, we're not interested in that $300,000. You know, we'll zero that out. You know, we're interested in paying $12,600,000. So the answer to your question, no, just the opposite. It's just the opposite. They bid off their nose to spite their face. Were they the second highest bidder once your bid was gone? That's an interesting question. Not only that, there were 11 bids, right? The highest, I can't remember, I think the highest was like $11 million the first time, and the lowest was $8 million, okay? They were the second lowest. The liquidator said, he came to court and he said, we'll do five, because we want to do best and final offer of the top five. And he said, you know, the defendants aren't in the top five, but because they know the property and they're a part of the lawsuit, let's let them do it too. So they submitted, so it was six who did, I mean, that's a liquidator who's bending over backwards for these defendants. And, you know, now they're saying he's doing something, that he's being biased. And the court said yes, but two or three times they said the court's biased. Would a judge who's biased have done that? Of course not. He was trying to be fair to the parties. They submitted their best and final offer. It was $1.1 million less than ours. $1.1 million. But it was the second highest. No. No. There were $200,000 and $12,500,000, third parties. I mean, this is a very valuable asset. This is not a trivial case. Anyway, thank you very much. Thank you, Mr. O'Connor. Mr. Collins for reply. Quickly, Justice Wright, to respond to your question there. Wouldn't it have been nice if we knew we could bid on MHR's partnership interest? That's not what the sale order said. We had 68.75%. We could have bid on the, you know, 30.25%. We weren't given that opportunity. It wasn't in the sale order. The assets were to be sold on what they pushed. Let me ask you real briefly a couple of questions about jurisdiction. Sure. It seems to me that it's pretty clear that an order granting or denying arbitration is injunctive in nature. I agree. That order is appealable under the case law within 30 days or at the end of the case. Well, at the end of the case. So you go in there and you ask for arbitration. It's denied. Instead of appealing it, then you get two bites. Does that make any sense to you? Then you go through the whole procedure, through all this court procedure, and then if you like the result, fine, great. If you don't like the result, then you go in and appeal the denial of arbitration at the end of everything, and I'm just not 100% certain I agree with you that that order is appealable either up front or at the end of the court proceedings. Well, I guess I would answer that two ways. Number one, my understanding is that is the way the case law is, okay? And the second thing is, well, yeah, you know, if you don't appeal it right away, you know, aren't you getting two bites of the apple? Well, the flip side of it is maybe the process resolves itself and you don't need an appeal at all so that you get something done and there is no appeal. So there's that flip side argument. And that is why while we're up on appeal, now, under 366, I'm trying to swoop jurisdiction on that issue. You can decide one way or the other on how to handle that at this point in time. But, I mean, I see your point exactly. I mean, but, hey, the case law, that's what you're allowed to do, and if you don't have to file the interlocutory appeal and the court goes through. Now, interesting thing, the judge did send part of our counterplanned arbitration, which we went through. Let me follow up with your answer to my question. If you were allowed to restructure your bid to bid on 30, what was the percentage? 31.25. 32%. Would you have increased the bid? I think there was testimony that we would have. What? At the hearing. Well, I'm not going to bid now, but we are up higher than anybody now at $13 million on an asset sale. Okay, and the asset sale has not as attractive consequences as if the partnership would remain intact. Which, Mr. Marconi could have wondered if they would have done some deal that we proposed before. I don't know why he's saying that. There was no deal that I'm aware of that he could say. Why is that being presented to this court? That's not part of the record. Whatever settlement negotiations happened between the parties, didn't happen between the parties. And then Jimmy Daly, who's, there's two other parts. No matter what happens in this case, Jim Daly operates those other two parts. And Mike Rose has about a 30% interest in those other two parts. So you stuck with Jim Daly and wonder what happens. I mean, you know, so I don't know why these things are coming to you just to try to emotionally maybe sway that we're the bad guys. You know, we're pursuing the litigation. Everything we do is delay. I mean, come on, we're trying to get this property. How do we damage it? We didn't get to buy the property. That's big damage. And courts award specific performance in all kinds of things with real estate. We're operating these properties. But if you had a $13 million bid when you submitted your sealed bids, you would have had the property, wouldn't you? Perhaps. And here's two reasons that you wouldn't do that. Number one, okay, there's nothing in the sale order that gives the receiver the discretion to say who he's going to take. Now, if the receiver has got the discretion and the receiver gets the discretion of who he's going to take and who's the highest and best bid, you're right. We're toast. We didn't do it. We weren't highest in that process. But that isn't what happened. We've got a sale order that says until that gavel comes down, until the court approves the sale and the term, boom, we are in the gate. So we're going to put it out there and we're going to bid until we can get it. Now, there was a provision in the sale order that said... But just a minute. What you're talking about is basically an auction because you're saying, well, this guy has bid higher. Wait a minute. We'll increase that by $400,000. And he says that. Well, so what you want is basically an auction. An auction would have been the proper way to do it under the case law. Is it required? Is it required? I suppose there might be an instance that it wouldn't be required, but on this particular scenario, when one party is allowed to refashion and re-bid and no one else is allowed to participate, I don't see how that's fair under any circumstances. And that's really the strongest argument. And that's why they're kind of attacking on jurisdiction. You didn't make it on time. But when you submitted your bid, you had no idea what the other bids were, correct, originally? These were sealed bids. What we do know, correct, what we do know is ours was the only binding offer. Ours had one condition, court approval. The others were letters of intent, let's negotiate. Theirs was for property that was not for sale. We were the only liable. We didn't want to do anything. And wait, there's one arm. We're in front of the bankruptcy court. We're in front of the business that does these things all the time. We're the only liable offer. We get it. We were the only liable offer on the table. And they were allowed to resubmit a new bid, entirely changing the substance terms and effectively the price, and no one else was allowed to. And no one else was even notified. There was two letters of intent at $2.5 million. Those people weren't brought in to say, how high would you go? Maybe they'd get a 15. I don't know. Thank you for your time. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. And right now we'll stand in recess until the 115th. Thank you. Thank you.